# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

HOOT WINC, L.L.C.,

Plaintiff,

v.

RSM McGLADREY FINANCIAL PROCESS OUTSOURCING, LLC, and DOES 1 to 50, inclusive,

Defendants.

RSM McGLADREY FINANCIAL PROCESS OUTSOURCING, LLC,

Counterclaimant,

v.

HOOT WINC, LLC,

Counterdefendant.

CASE NO. 08cv1559 BTM(WMc)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant RSM McGladrey Financial Process Outsourcing, LLC ("FPO" or "Defendant") has filed a motion for partial summary judgment on Plaintiff's tort claims. For the reasons discussed below, Defendant's motion is **GRANTED IN PART** and **DENIED IN PART.**

## I. FACTUAL BACKGROUND

Plaintiff Hoot Winc, LLC ("Plaintiff" or "Hoot Winc"), is a Kansas limited liability

company, with its principal office in Oceanside, California. During the relevant time period, Hoot Winc provided certain management services to approximately 22 Hooters restaurants located in five different states (the exact number of restaurants varied slightly during the contract period). Each restaurant was a separate limited liability company, and each restaurant was under the umbrella of a regional holding company. Hoot Winc refers to the stores and regional holding companies as the "Hoot Winc Franchise Group."

Defendant FPO was a business services outsourcing company organized and existing under the laws of Minnesota. FPO was a wholly owned subsidiary of RSM McGladrey, Inc. (Ofenloch Dep. (Def. Ex. D) 13:17-21.) RSM McGladrey, Inc. was a services firm that provided tax services and consulting services. (Ofenloch Dep. 13:21-24.)

Before Hoot Winc engaged FPO's services, Hoot Winc performed accounting operations for the Hoot Winc Franchise Group. Among other things, Hoot Winc handled payroll, accounts payable, and bank reconciliations. Hoot Winc also prepared profit and loss statements and balance sheets for the individual store locations, roll ups by region, and combined financial statements. (Debisaran Decl. ¶ 3.) According to Plaintiff, the accuracy and timeliness of the financial data contained in these reports were critical to the Hoot Winc Franchise Group's operational success, its ability to achieve internal growth goals, and its ability to make pro rata distributions to those persons holding an ownership interest in the members of the Hoot Winc Franchise Group. (Debisaran Decl. ¶ 14.)

In 2005, Hoot Winc began exploring the possibility of outsourcing its accounting functions. In the fall of 2005, Maureen Debisaran, the CFO of Hoot Winc, attended a National Restaurant and Finance Trade Show in Las Vegas, where Debisaran met Lesley Woodring and Ken Johnson, two of FPO's Directors of Business Development. (Debisaran Decl. ¶ 6.) Debisaran had a discussion with Woodring and Johnson regarding the outsourcing services FPO could provide Hoot Winc. (Id.) Woodring and Johnson also provided Debisaran with marketing materials. (Spitcaufsky Decl. ¶ 5, Exs. 2,3,4.)

According to Debisaran, at the trade show, Woodring and Johnson represented that FPO was a full-service accounting and CPA firm. (Id.) Woodring and Johnson also

allegedly told Debisaran that the services provided to Hoot Winc would be performed by staff in Chicago and Wisconsin with restaurant-specific experience. (Id. at ¶ 7.)  Woodring and Johnson explained that basic data entry would be provided by persons in India but that the substantive work would be done in Chicago and Wisconsin. (Id.)

In December 2005, FPO traveled to California to meet with Hoot Winc.  At the meeting, FPO gave a PowerPoint presentation.  The PowerPoint Presentation represented that "RSM McGladrey" had more then 160 offices in the United States, outsourcing operations were performed at 14 accounting centers in the country, RSM McGladrey had a "national accounting firm culture," RSM McGladrey had been in the accounting business for 75 years, and RSM McGladrey hired and staffed professionals with industry experience. (Pl. Ex. 7.) According to Debisaran, nothing was said about accounting services being provided from India. (Debisaran Decl. ¶ 12.)  Debisaran and Larry Spitcaufsky, managing member of the Hoot Winc Franchise Group, recall that Woodring and Johnson again explained that their company was a national accounting firm and that CPAs with restaurant specific experience would be the ones providing accounting services from accounting centers in the United States. (Debisaran Decl. ¶ 12; Spitcaufsky Decl. ¶ 6.)

Representatives from FPO also told Debisaran that she would be able to generate her own customized financial reports through the "FRX writer," which would allow Debisaran to select and organize financial data and generate customized reports. (Debisaran Decl. ¶ 11.) The ability to generate these reports was important to Debisaran because she already had this ability and wished to retain it.  (Id.)

On December 28, 2005, Hoot Winc and FPO entered into a services agreement ("Services Agreement") pursuant to which FPO agreed to provide an array of business support services to Hoot Winc and the Hoot Winc Franchise Group including, but not limited to, preparation of financial statements, maintaining and processing payroll, invoice entry, invoice coding, weekly accounts payable and cash requirements, check preparation and mailing, processing of employee expense reports, preparation of 1099 forms, daily cash deposit verification, filing of tax returns, and making tax payments. (Pl. Ex. 6.)  In exchange

for FPO's business support services, Hoot Winc agreed to pay FPO a fee of $595 per restaurant per period plus an additional $350 per period for accounting services provided to Hoot Winc itself. The total per-period fees amounted to $14,035.

A "go-live" date of February 20, 2006 was selected. As of the "go-live" date, Hoot Winc would depend upon FPO for the contracted services. In anticipation of the transition, the in-house accounting staff at Hoot Winc was reduced. (Debisaran Dep. (Pl. Ex. 9) 149:11-150:16.) On February 23, 2006, FPO granted eight users in India access to Hoot Winc's databases in Great Plains. (Pl. Ex. 46.)

According to Hoot Winc, there were problems with FPO's performance from the time of the "go-live" date until the termination of the contract. Hoot Winc claims that FPO made repeated and numerous mistakes, including: failure to deliver timely and accurate financial statements; failure to grant Debisaran access to the FRX reports; making overpayments, duplicate payments, and underpayments on vendor invoices; failure to pay invoices resulting in the shut-off of some utilities; payroll errors; and failure to properly communicate with Hoot Winc and Hooters general managers. (Debisaran Decl. ¶¶ 19, 23, Ex. 1.)

On May 9, 2006, at the request of Debisaran, FPO and Hoot Winc met at FPO's offices in Chicago. At the meeting, FPO made a PowerPoint presentation. (Pl. Ex. 10.) The presentation revealed that more work was being done in India than Hoot Winc realized. The presentation revealed that FPO had two centers in Mumbai with 400 personnel. The presentation also explained how work was coordinated between the India center and the U.S. offices. According to the presentation, after India entered data and the computer system generated certain reports, India "chartered accountants" accessed the website to review management reports and analysis, make any required adjustments at the Business Unit level, and create customized reports from the website.

Debisaran was shocked to learn about the level of India's involvement in Hoot Winc's account. (Debisaran Dep. (Pl. Ex. 30) 360:7-25.) Prior to the meeting, Hoot Winc believed that India was performing data entry only. (Id.)

Hoot Winc claims that after the May meeting, FPO continued to fail to provide

accurate and timely financial statements. Hoot Winc contends that it never received a timely and accurate financial statement from FPO. (Spitcaufsky Decl. ¶ 10; Debisaran Decl. ¶ 19.)

Hoot Winc CEO Fred Glick became increasingly frustrated by the untimely financials. On June 16, 2006, Glick e-mailed FPO, stating, “We do NOT have our store financials (we have 3 out of 23 stores). We do not know where they are or when we will get them. This is fourth period in a row where we are behind on getting financials.” (Pl. Ex. 17.) On June 28, 2006, Glick informed FPO: “[O]ur board is unhappy with the results we have seen thus far and is discussing sending a default letter. It is CRITICAL to our company’s success that we receive timely accurate information. We have not had that in the 5 months we have been outsourcing.” (Pl. Ex. 18.) In an e-mail to FPO dated August 31, 2006, Glick wrote “I asked you twice to get your India team some qualified help as I DO believe that both of you (Mike and Mike) clearly understand what needs to be done and I do NOT have confidence that they do. . . . My next communication will be stating that until I am receiving financials that I can use to run my business, I will not be paying a portion of our bill. It is time for all excuses to end and for you to perform.” (Pl. Ex. 37.) In an e-mail dated October 18, 2006, Glick e-mailed Mike Mengarelli, FPO’s Relationship Manager and Vijay Bhatt, an India Team employee: “I am absolutely and utterly fed up with the lack of communication and execution on deadlines from your company. I want to have a conference call with the head of India and America restaurant operations tomorrow to discuss whether or not we can continue our business relationship. When deadlines are missed that are personally given to me I expect direct communications on exactly why they were not met and when I WILL receive the requested necessary contracted data. . . . [Y]our company is not performing the necessary contracted data on a timely and accurate basis and has cost OUR company tens and thousands of dollars in lost opportunity and my time.” (Pl. Ex. 39.)

As a result of a conversation between Glick and representatives from FPO on October 18, 2006, FPO came up with a Client Service Action Plan (Pl. Ex. 43) to address issues concerning the Hoot Winc account. Action items included having reports reviewed by the Client Account Manager, replacing the Client Account Manager, getting quality support for

the India team, and reducing the attrition rate in India. (Id.)

On October 30, 2006, Tyrone Murray replaced Debisaran as CFO of Hoot Winc. (Murray Dep. (Pl. Ex. 58) 62:16-21.) The first week on his job, Murray received his first set of financial statements. (Id. at 168:8-11.) Murray was concerned about the lack of quality of work reflected in the statements. (Id. at 168:18-20.) In November 2006, Jamie Hogan, FPO's new Relationship Manager, traveled to California to meet with Murray and Glick and discuss the account. (Hogan Dep. (Def. Ex. II) 104:13-105:2.) According to Murray, Hogan admitted to him that the people in India working on the account did not have degrees. (Murray Dep. 175:3-12.) Murray claims that shortly afterwards, he concluded that he did not have confidence in FPO and that the contract should be terminated. (Id. at 175:18-176:11.)

On December 22, 2006, Murray sent a letter to FPO terminating the Services Agreement. (Def. Ex. EEEEE.)

## II. PROCEDURAL BACKGROUND

On August 22, 2008, this action was removed from state court. In an order filed on January 21, 2009, the Court granted Plaintiff leave to file a First Amended Complaint ("FAC"). The FAC was filed the same day.

In an order filed on August 10, 2009, the Court granted FPO's motion for partial summary judgment on Plaintiff's professional negligence claim to the extent that it was based on California law. The Court held that pursuant to the choice-of-law provision in the Service Agreement, Minnesota law governed Plaintiff's claims and Plaintiff was therefore precluded from pursuing a professional negligence claim under California law.

In an order filed on November 12, 2009 ("11/12/09 Order"), the Court granted in part and denied in part Defendant's motion for partial summary judgment which was premised on the Services Agreement's limitation-of-liability clause. The Court held that the Services Agreement's limitation-of-liability clause was enforceable with respect to Plaintiff's breach of contract claim, negligent representation claim, and professional negligence claim to the extent that it alleges ordinary negligence. The Court further held that under Minnesota law,

the limitation-of-liability clause does not limit the amount of damages recoverable on Plaintiff's claim for willful and wanton professional negligence.

With respect to Plaintiff's claim for willful and wanton professional negligence, the Court explained: "Although the FAC is short on facts supporting Plaintiff's allegations regarding willful and wanton negligence, Defendant did not move to dismiss on this ground. Accordingly, Plaintiff may proceed with its claim for willful and wanton professional negligence, and such claim is not subject to the limitation-of-liability clause." (11/12/09 Order at 6:3-7.) In a footnote, the Court pointed out that it was unclear whether Plaintiff intended to assert a claim for "reckless misrepresentation" a separate cause of action under Minnesota law. (Id. at 6 n. 3.) The Court stated: "The FAC makes no allegations regarding reckless misrepresentation. If Plaintiff wishes to assert a claim for reckless misrepresentation, Plaintiff can bring a motion for leave to amend."

In an order filed on February 19, 2010, the Court granted Plaintiff leave to file a Second Amended Complaint adding a fifth cause of action for reckless misrepresentation and adding factual allegations and punitive damages allegations in connection with the willful and wanton professional negligence claim.

In an order filed on February 22, 2011, the Court denied FPO's motion for partial summary judgment, which sought to preclude Plaintiff from seeking or recovering damages allegedly sustained by 34 Hooters entities not named as plaintiffs in this lawsuit. The Court ruled that there was a triable issue of fact whether Hoot Winc entered into the Services Agreement as an agent for undisclosed principals (which would allow Hoot Winc to sue in its own name for damages sustained by the 34 Hooters entities as a result of any failure by FPO to perform under the contract). The Court granted Plaintiff leave to file a Third Amended Complaint pleading the agency theory of liability.

On March 14, 2011, Plaintiff filed its Third Amended Complaint ("TAC"). The TAC alleges claims of professional negligence, breach of contract, fraud, negligent misrepresentation, and reckless misrepresentation.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains. Celotex, 477 U.S. at 314. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." Anderson, 477 U.S. at 256. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

FPO seeks partial summary judgment on Plaintiff's claims for gross, willful or wanton negligence (First Cause of Action), fraudulent and reckless misrepresentation (Third and

Fifth Causes of Action), fraudulent concealment (Third Cause of Action), Negligent Misrepresentation (Fourth Cause of Action), and punitive damages. For the reasons discussed below, the Court grants FPO's motion as to the negligent misrepresentation claim and denies the motion as to the remaining claims.

**A. Gross, Willful or Wanton Negligence**

FPO contends that there is no evidence that FPO's performance of the contract rises to the level of gross or willful or wanton negligence. The Court disagrees.

Under Minnesota law, "gross negligence" is defined as "very great negligence or absence of even slight care, but as not equivalent to wanton and willful wrong." Ackerman v. American Family Mutual Ins. Co., 435 N.W.2d 835, 840 (Minn. Ct. App. 1989). In contrast, "willful and wanton negligence" is "a failure to exercise ordinary care after discovering a person or property in a position of peril." Honeywell, Inc. v. Ruby Tuesday, Inc., 43 F. Supp. 2d 1074, 1080 (D. Minn. 1999). A cause of action for willful and wanton negligence arises where there has been "a reckless disregard of the safety of the person or property of another by failing *after and not before* discovering the peril to exercise ordinary care to prevent the impending injury." Brannan v. Shertzer, 64 N.W.2d 755, 757 (Minn. 1954).

Although the evidence may not be sufficient to show that FPO failed to exercise even slight care, there is a triable issue of material fact with respect to whether FPO engaged in willful and wanton negligence.[1] There is evidence suggesting that FPO might have known before the "go-live" date that it did not have the resources or ability to perform the Services

---

[1] FPO argues that if there is insufficient evidence that FPO committed gross negligence, Hoot Winc cannot prevail on its willful and wanton negligence claim as a matter of law because willful and wanton negligence requires a "higher degree" of wrong than gross negligence. The Court rejects this argument. The Court has not located any cases holding that if a defendant is not liable for gross negligence, then, *a fortiori*, the defendant is not liable for willful or wanton negligence. The gross negligence standard focuses on a complete lack of care while the willful and wanton negligence standard focuses on knowledge of peril and failure to exercise care to prevent the impending harm. The standards are different in nature, and it is imprecise to characterize one as "higher" or "lower" than the other.

Agreement as promised, but nonetheless forged ahead with the transition.

In an e-mail dated January 26, 2006, Tracy Dallas (Restaurant Systems Manager at FPO) wrote to Julia Donavant (Director of Transition Services at FPO) and Trinetter Sims (Accounting Transition Manager):

> Good afternoon, ladies.
>
> This database situation, as well as the AP history import request and the GL historical import request for additional years, is a train wreck waiting to happen if you do not push back dates on the project plan and update the contract with adjusted pricing. This cannot be another Houlihan's nor Nath . . . there are too many databases involved, and too few IT resources available.

(Pl. Ex. 45.)[2]

In her deposition on July 22, 2010, Dallas claimed that her e-mail was referring to specific requests by Hoot Winc to perform additional work, not the contracted services as a whole, and that the issues were resolved before the "go-live" date. (Dallas Dep. (Def. Ex. HH) 190:3-196:10.) However, the e-mail could also be construed as indicating that Dallas was concerned that FPO lacked the resources to properly perform the contracted services because there were so many databases (20+) due to the number of restaurants. Whether Dallas's deposition testimony is a credible explanation of her prior statement must be determined by the trier of fact.

Other evidence can also be interpreted as supporting Hoot Winc's claim that FPO realized that it lacked the ability to properly provide the contracted services prior to the "go-live" date but went ahead with the transition anyway. In an e-mail dated April 28, 2006, Glen Ofenloch, FPO's Director of Restaurant Accounting, wrote:

> The Hootwinc contract was signed in December before we initiated the new Restaurant Info. Form which would have potentially identified the complexity of this client before we promised a 4 day turn on F/S.
>
> . . . .
>
> We grossly underestimated how long it would take to close 22 separate companies in 4 days given that store manager excel workbooks are the "Bible" for this client. FPO is expected to reconcile 22 company workbooks to the G/L

---

[2] To the extent the Court relies on any evidence in this Order, any evidentiary objections to the evidence are overruled. The Court does not strike evidence submitted in support of motions and therefore denies the parties' requests to strike evidence.

> each close, answer questions from 22 separate store managers, reprint G/L's etc. from 22 separate databases, etc. We now think it will take approx. 3-4 accountants in India for 10 days a month (the "close" process) to make this happen in addition to Bill Tracy, the FPO Manager.

(Pl. Ex. 15.) Although this e-mail was written after the "go-live" date, viewed in conjunction with Dallas's e-mail, there is a triable issue whether FPO realized that it had "grossly underestimated" how long it would take to close 22 separate companies *prior* to the "go live" date.[3]

There is also evidence that the contract was under-bid in an effort to get Hoot Winc as a client. Bill Tracy, FPO's Account Services Manager, told Debisaran that FPO under-bid the contract because Hoot Winc was an important name to add to FPO's list of clients. (Debisaran Dep. (Pl. Ex. 30) 344:23-345:10.) Tracy indicated that it would be difficult for FPO to continue servicing Hoot Winc because they were losing money. (Id. at 345:7-9.) Similarly, on May 9, 2006, Mike Mengarelli, Relationship Manager, told Debisaran and Rick Campbell, Hoot Winc's auditor/CPA, that sales sold something that FP "could not deliver" for that fee. (Campbell Dep. (Ex. C to Supp. Durone Decl.) 329:13-19.)

If FPO underestimated how much work the account would be and also purposefully underbid the contract, it is possible that by the time of the "go-live" date, FPO found itself in the position where it could not allocate the proper resources to the Hoot Winc account. Notably, FPO went through two rounds of downsizing, the first in January 2006 and the second in May 2006. (Dallas Dep. (Pl Ex. 47) 80:2-84:14.) In the first round, an individual who worked in IT and was involved in the Hootwinc account was laid off. (Id. at 79:16-80:1.)

Viewing the evidence in the light most favorable to Hoot Winc, there is a genuine issue of material fact with respect to whether FPO knew, prior to the go-live date, that it lacked the resources to properly perform the Services Agreement. In addition, FPO knew that Hoot Winc had reduced its in-house accounting staff and was relying on FPO to perform the services after the "go-live" date. (Pl. Ex. 1 at 5.) In light of the comprehensive nature of

---

[3] To the extent that FPO argues that Hoot Winc was the cause of FPO's ultimate failure to deliver timely and accurate financial reports, there is certainly a triable issue of fact regarding who was at fault for FPO's failure to perform.

the financial services FPO was to provide, FPO also arguably knew that failure to properly perform such services would result in disruption to the Hoot Winc Franchise Group's business and cause financial harm. Accordingly, there is a triable issue as to whether FPO is liable for willful and wanton negligence.

FPO contends that under Minnesota law, the claim of willful and wanton negligence is limited to personal injury or property damage cases. This Court is not persuaded by this argument. The Court has not located any cases holding that a claim of willful and wanton negligence cannot be brought in cases involving financial harm. Indeed, in American Litho, Inc. v. Imation Corp., 2010 WL 681298 (D. Minn. Feb. 23, 2010), the court held that there was a genuine issue of material fact with respect to whether the defendant, Imation, committed willful or gross negligence in entering into a license agreement with the plaintiff, American Litho. Under the license agreement, American Litho was authorized to use Imation's patented infra-red dye for developing a near infra-red printing plate. However, Imation had already granted an exclusive license to the patents at issue to Kodak. The court held that there was a fact issue regarding whether Imation was willfully or grossly negligent in failing to investigate whether it had given Kodak an exclusive license to practice its patents. Id. at *7.

FPO also argues that Hoot Winc's willful and wanton negligence claim fails because Hoot Winc cannot establish "precise" knowledge of an "imminent" peril. The Court has reviewed the cases cited by FPO – Waltz v. Life Time Fitness, Inc., 2010 WL 2900139 (Minn. Ct. App. July 27, 2010); Hille v. County of Wright, 400 N.W.2d 744 (Minn. Ct. App. 1987); Peterson v. Honeywell, Inc., 1994 WL 34200 (Minn. Ct. App. Feb. 8, 1994) – and does not interpret them as requiring that the potential injury be immediate or that the defendant must know exactly how and to what extent the plaintiff will be harmed. The Court finds it sufficient that FPO arguably knew that Hoot Winc and the Hoot Winc Franchise Group were in a position of peril because the failure of FPO to deliver the contracted services would result in the interruption of the Hoot Winc Franchise Group's business and cause economic loss. FPO's motion for summary judgment on Hoot Winc's First Cause of

Action is denied.

**B. Fraud Claims**

Hoot Winc asserts a claim of fraud in its Third Cause of Action. Hoot Winc claims that FPO made fraudulent misrepresentations and failed to disclose important material facts that induced Hoot Winc into entering into the Services Agreement and transitioning its in-house accounting operations to FPO. Hoot Winc also asserts a reckless misrepresentation claim in its Fifth Cause of Action.

The alleged misrepresentations and failures to disclose generally fall into four categories:

1. Misrepresentations that FPO was a full-service national accounting and CPA firm, and that CPAs with restaurant-specific experience would be servicing Hoot Winc's account.

2. Failure to disclose that the work was being performed in India by individuals without degrees.

3. Misrepresentations regarding the services FPO promised to perform.

4. Misrepresentations/failures to disclose regarding the ability of FPO to provide the contracted services.[4]

FPO contends that Hoot Winc's fraud and misrepresentation claims fail because the statements at issue are (1) related to future performance (2) non-actionable statements of opinion or "puffery" (3) true statements (4) not material, or (5) not justifiably relied upon in light of the terms of the Services Agreement between the parties and/or surrounding facts. Upon review of the alleged misrepresentations, the Court agrees that some of the misrepresentations do not support a claim for fraud or reckless misrepresentation. However, the Court finds that some of the alleged misrepresentations are actionable.

With respect to statements regarding future performance – e.g., statements that FPO would provide "financial and operational information that is complete, accurate, and up-to-

---

[4] The Court declines to separately analyze each alleged misrepresentation/ concealment identified in the TAC and discovery. FPO may bring motions in limine with respect to specific evidence prior to trial.

date," would provide a four-day turn around on financial statements, and that Hoot Winc would be able to generate its own customer reports – the Court agrees that such statements are not actionable as fraudulent misrepresentations. The elements of fraud in Minnesota are: (1) There must be a representation; (2) That representation must be false; (3) It must have to do with a past or present fact; (4) That fact must be material; (5) It must be susceptible of knowledge; (6) The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true of false; (7) The representer must intend to have the other person induced to act, or justified in acting upon it; (8) That person must be induced to act or so justified in acting; (9) That person's action must be in reliance upon the representation; (10) That person must suffer damage; (11) That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury. Davis v. Re-Trac Mfg. Corp., 149 N.W.2d 37, 38-39 (Minn. 1967). It is a "well-settled rule" that "a representation or expectation as to future acts or events is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place." Belisle v. Southdale Realty Co., 168 N.W.2d 361, 363 (Minn. 1969).

A fraud claim may be brought if a defendant does not intend to fulfill a promise *at the time it is made*. Benson v. Rostad, 384 N.W.2d 190, 195 (Minn. Ct. App. 1986). However, "[a] subsequent intention to break the promise or failure to fulfill it does not constitute fraud." Id. Here, there is no evidence that FPO did not intend to perform the promises at the time they were made.

With respect to representations regarding *ability* to perform – e.g., that FPO was fully capable of providing timely and accurate financial services to Plaintiff's twenty-three restaurants, that FPO had sufficient staff possessing the necessary competence and restaurant industry experience to deliver the accounting services, and FPO was able to transition in-house accounting operations to FPO in a timely fashion without significant interruption of business operations – the Court finds that these representations are statements of present ability not future performance. If FPO made these representations

*without knowledge of whether they were true of false*, Hoot Winc can pursue a claim of reckless misrepresentation, a form of fraud. See Zutz v. Case Corp., 422 F.3d 764, 770 (8th Cir. 2005); Florenzano v. Olson, 387 N.W.2d 168, 177 n.2 (Minn. 1986) (Simonett, J., concurring specially). As previously discussed, there is evidence that the contract was purposefully underbid. In addition, there is evidence that FPO did not adequately investigate what Hoot Winc's needs were and therefore did not have a full understanding of the complexity of the project and the resources that would be needed to service the account. (Pl. Ex. 15.) Based on this evidence, the Court concludes that there is a genuine issue of matieral fact with respect to whether FPO had a legitimate basis for representing that it was able to properly provide the services at issue.

Hoot Winc can also bring a fraudulent concealment claim on the theory that prior to the "go-live" date, FPO realized that it did not have the ability to properly perform the contracted services but failed to disclose these facts to Hoot Winc, thereby inducing it to transition its accounting functions to FPO. As a general rule, a party to a transaction has no duty to disclose material facts to the other. Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648, 650 (Minn. 1976). However, "[o]ne who speaks must say enough to prevent his words from misleading the other party," and "[o]ne who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these fact to the other party." Id. If FPO represented that it was fully capable of performing the services at issue and then discovered that it actually lacked the resources to properly perform the work, FPO had an obligation to disclose this material fact to Hoot Winc before Hoot Winc turned over its accounting functions to FPO.

The Court also finds that Hoot Winc can bring a fraud claim based on representations that (1) FPO was a full-service national accounting and CPA firm, and that (2) CPAs with restaurant-specific experience would be servicing Hoot Winc's account. In his declaration, Larry Spitcaufsky states that during the December 2005 meeting at Hoot Winc's offices, FPO's representatives stated that they were a national accounting firm based in Chicago, Illinois, and that they had been in the accounting business for over 75 years. (Spitcaufsky

Decl. ¶ 6.) The FPO representatives also stated that they had numerous Certified Public Accountants on their staff who had specific restaurant experience and that CPAs with restaurant specific experience would be the ones providing accounting services to the Hoot Winc Franchise Group. (Id.) Spitcaufsky states that it was important to him to have accounting services for the Hoot Winc Franchise Group performed by a national accounting firm staffed by CPAs with restaurant specific experience and that he relied on what the FPO representatives had said when deciding to direct Debisaran to sign the Services Agreement. (Id. at ¶¶ 7-8.)

FPO argues that Spitcaufsky's declaration is a "sham affidavit" that should be disregarded as contradictory of prior deposition testimony. In his deposition, Spitcaufsky indicated that he never "talked" to anyone at FPO. (Spitcaufsky Dep. (Def. Ex. B) 249:8-9.) However, Spitcaufsky indicated that he did attend a meeting with them. (Id. at 249:3-6.) During his deposition, Spitcaufsky also said, "No," when asked if he could remember anything that was said either to him or others in his presence by any representative of FPO before the contract was signed. (Spitcaufsky Dep. (Ex. J to Supp. Durone Decl.) 226:1-6.).

To avoid gamesmanship by opposing attorneys, the sham affidavit rule "should be applied with caution." Sch. Dist. No. 1J v. ACandS, Inc., 5 F.3d 1255, 1264 (9th Cir. 1993). Ninth Circuit cases have "emphasized that the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998-99 (9th Cir. 2009). "Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986).

Here, Spitcaufsky claims that FPO made the representations in question during a meeting, not a one-on-one conversation. Therefore, his deposition testimony that he never "talked" to anyone at FPO is not inconsistent. Furthermore, during his deposition, Spitcaufsky indicated that he did not *recall* whether anyone at FPO said anything in his presence "before the contract was signed." The question was ambiguous as to whether

"before" was referring to a time immediately before the contract was signed or anytime prior to December 28, 2005. Moreover, Spitcaufsky's testimony concerned what he recalled at that time. His deposition testimony is not clearly and unambiguously inconsistent with his declaration. Therefore, the Court will not strike Spitcaufsky's declaration as a sham affidavit.

FPO also argues that it was not reasonable for Hoot Winc to rely on any representations regarding FPO being a CPA firm because the Services Agreement provided:

> The financial reports are intended for internal management use only. It is understood that Client is knowledgeable about the basis of accounting and assumptions used in preparing the financial statements. These statements are not intended for distribution to third parties. RSM is not independent, and will not audit or review the financial statements, nor provide an opinion or any other form of assurance on the financial statements.

(Services Agreement, ¶ 6.5.) The Court is not persuaded by this argument. Even though FPO was not performing CPA work (external auditing), it is plausible that Hoot Winc believed that a CPA firm and CPAs have a higher level of expertise with respect to financial/accounting matters in general. It would not be unreasonable for someone to rely on the "CPA" designation as assurance of a certain level of training and knowledge.

FPO points out that their marketing materials made it clear that FPO was a subsidiary of RSM McGladrey, Inc. The last page of one of the brochures given to Debisaran in the Fall of 2005 explains:

> **About Us**
>
> RSM McGladrey Financial Process Outsourcing provides back office outsourcing solutions to retailers. We objectively assess our clients' needs and provide cost-effective solutions in accounting, management information, bill paying, payroll and tax reporting.
>
> . . . .
>
> RSM McGladrey Financial Process Outsourcing is a subsidiary of RSM McGladrey, Inc., which offers a broad array of services, including business and tax consulting, wealth management, retirement resources, payroll services, corporate finance and financial process outsourcing. RSM McGladrey, Inc. is an independent member of RSM International – an affiliation of independent accounting and consulting firms.
>
> (Def. Ex. F.)

In other marketing materials, however, the distinction between FPO and RSM McGladrey, Inc. was blurred. These materials referred to "RSM McGladrey," without

distinguishing between FPO and its parent, and touted the company's "national accounting firm culture" and its accounting experience ("in accounting business for 75 years"). (Exs. 1, 3, & 4 to Spitcaufsky Decl.) Viewing the evidence as a whole, the Court cannot conclude that it was unreasonable as a matter of law for Hoot Winc to rely on explicit representations that FPO was a CPA firm and that CPAs would be servicing the Hoot Winc account.

As for FPO's alleged failure to disclose that more than data entry was being done in India, the Court concludes that any concealment of that fact alone cannot give rise to a fraud claim. The Services Agreement provides: "RSM shall retain the right to delegate, under our supervision, without Client's consent, any part of its performance to any subcontractor it reasonably deems to be reliable or an RSM International affiliated entity it reasonably deems to be reliable." (Services Agreement, ¶ 5.2.) The Services Agreement also includes an integration clause, which states:

> This Agreement . . . shall constitute the entire Agreement between the parties governing the subject matter of this Agreement. RSM shall not be deemed to have made any representations or warranties as to its performance except as expressly set forth in this Agreement. The provisions of this Agreement supersede all prior oral and written promises, representations, communications, Agreements and understanding of the parties in respect to the subject matter of this Agreement. Only both parties agreeing to the amendment in writing may amend this Agreement.

(Services Agreement, ¶ 10.0.)

Under Minnesota law, reliance on a representation made before entering into a written contract with an integration clause is not reasonable if the contract contains terms in plain contradiction of the prior representation. Thomas W. Lyons, Inc., v. Sonus-USA, Inc., 2009 WL 306703, at * 7 (D. Minn. Feb. 9, 2009). As explained by the Minnesota Court of Appeals:

> We could find that reliance on an oral representation was unjustifiable as a matter of law only if the written contract provision explicitly stated a fact completely contradictory to the claimed misrepresentation. Clements Auto Co. v. Service Bureau Corporation, 444 F.2d 169, 179 (8th Cir.1971) (citing Vint v. Nelson, 267 Minn. 490, 127 N.W.2d 177 (1964) ). When a promise is not in plain contradiction of a contract or, if contradictory, when it is accompanied by misrepresentations of other material facts in addition to the contradictory intent, the question of reasonable reliance is for the trier of fact. General Corporation, 184 F.Supp. at 239.

Johnson Bldg. Co. v. River Bluff Dev. Co., 347 N.W.2d 187, 195 (Minn. Ct. App. 1985).

Here, the contract explicitly gives FPO the right to delegate any part of its performance, without Hoot Winc's consent, to any subcontractor or RSM International affiliated entity it reasonably deems to be reliable. Although Hoot Winc may have understood, based on FPO's presentations and marketing materials, that the accounting work would be done by FPO in the United States, it does not appear that FPO ever represented that it would never subcontract the work to others within the United States or in another country. Even if FPO did make such a promise, it would not have been reasonable for Hoot Winc to rely on it because the terms of the contract are in plain contradiction.[5]

The issue of whether FPO fraudulently concealed that *individuals without degrees* were performing substantive work on the account is separate and distinct from the issue of where the work was being performed.[6] A representation that CPAs with restaurant-specific experience would be servicing the account does not directly contradict the contract language that FPO may delegate any part of its performance to any subcontractor *it reasonably deems to be reliable* or an RSM International affiliated entity *it reasonably deems to be reliable*. Considered together with the alleged representation that CPAs with restaurant-specific experience would be servicing the account, the contract language could be interpreted as allowing FPO to subcontract the work *as long as the subcontractors are CPAs with restaurant experience.* Accordingly, Hoot Winc can base a fraudulent concealment claim on the theory that FPO knew, prior to the "go-live" date, that it was going to assign

---

[5] Hoot Winc also argues that FPO represented that it would keep Hoot Winc's information confidential but then failed to disclose that FPO gave the India office access to Hoot Winc's databases. However, it seems that by agreeing that FPO could delegate performance of the contract without Hoot Winc's permission, Hoot Winc also consented that FPO could share whatever information would be needed for the third party to perform the subcontracted work.

[6] There is a triable issue whether the individuals in India working on the account held degrees and had restaurant expertise. Although FPO claims that the India staff were "chartered" accountants (the equivalent of U.S. Certified Public Accountants) (Hogan Dep. (Def. Ex. II) 55:1-57:22), Hogan allegedly told Murray in November of 2006 that the individuals working on the account did not have degrees. (Murray Dep. (Pl. Ex. 58) 172:10-16.) Although Hogan's alleged statement was not specific as to time, it is sufficient to raise a triable issue regarding the qualifications of the individuals working on the account.

individuals who were not CPAs to perform substantive work on the account but failed to inform Hoot Winc of that development.[7]

For the reasons discussed above, the Court denies FPO's motion for summary judgment on Hoot Winc's claims of fraud (Third Cause of Action) and reckless misrepresentation (Fifth Cause of Action).

**C. Negligent Misrepresentation**

In addition to claims of fraud and reckless misrepresentation, Hoot Winc asserts a claim of "negligent misrepresentation" (Fourth Cause of Action). This claim fails as a matter of law.

Under Minnesota law, a person may be held liable for negligent misrepresentation "when supplying information for the guidance of others in the course of a transaction in which one has a pecuniary interest, or in the course of one's business, profession, or employment." Safeco Ins. Co. of America v. Dain Bosworth Inc., 531 N.W.2d 867, 870 (Minn. Ct. App. 1995). In contrast, where "adversarial parties negotiate at arm's length, there is no duty imposed such that a party could be liable for negligent misrepresentations. In these situations, the injured party's remedy is to sue either in contract or to sue for intentional misrepresentation." Id. at 871. Thus, Minnesota courts have disallowed claims of negligent misrepresentation in cases where commercial parties, with no special relationship, engaged in a business transaction. See, e.g., Signature Bank v. Marshall Bank, 2006 WL 2865325 (Minn. Ct. App. Dec. 20, 2006); Smith v. Woodwind Homes, Inc., 605 N.W.2d 418 (Minn. Ct. App. 2000); La Parilla, Inc. v. Jones Lang LaSalle Americas, Inc., 2006 WL 2069207 (D. Minn. July 26, 2006).

There was no special relationship between Hoot Winc and FPO: FPO was not providing advice or guidance to Hoot Winc. This lawsuit arises out of an ordinary

---

[7] Although there is evidence supporting a claim of fraudulent concealment with respect to work being done by individuals without degrees, it is less clear whether Hoot Winc can establish fraudulent misrepresentation – i.e., that *at the time* FPO represented that CPAs with restaurant experience would be servicing Hoot Winc's account, FPO knew that it would staff the account with individuals without degrees.

commercial transaction between two sophisticated parties. Therefore, while Hoot Winc can pursue claims of breach of contract and fraud, Hoot Winc cannot sue for negligent misrepresentation. FPO's motion for summary judgment is granted as to this claim.

### D. Punitive Damages

FPO moves for summary judgment on Hoot Winc's punitive damages claim on the ground that Hoot Winc cannot establish by clear and convincing evidence that FPO acted with "deliberate disregard" of Hoot Winc's rights. See Minn. Stat. Ann. § 549.20. In light of the Court's denial of FPO's motion on Hoot Winc's claims for fraud, reckless misrepresentation, and willful and wanton negligence, the Court will allow the punitive damages claim to proceed.

## V. CONCLUSION

For the reasons set forth above, FPO's motion for partial summary judgment [Doc. No. 185] is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to Plaintiff's Fourth Cause of Action for negligent misrepresentation. The motion is **DENIED** as to the remaining causes of action.

**IT IS SO ORDERED.**

DATED: September 6, 2011

Honorable Barry Ted Moskowitz
United States District Judge

